# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**ROBERT JORDAN,**
        **Plaintiff,**

    v.                                           **Case No. 11-CV-00334**

**ARANDELL CORPORATION,**
        **Defendant.**

## DECISION AND ORDER

Plaintiff Robert Jordan is suing his former employer for employment discrimination. Before me now is defendant's motion for summary judgment.

## I. BACKGROUND

Plaintiff is an African-American male who began working for defendant Arandell Corporation in December 2006. Defendant is in the business of printing and binding catalogs, and there are three types of workers in its plant. Machine operators set up and run the machines or "stitchers" that assemble and bind catalogs, bindery workers or "pocket feeders" insert catalog pages into the "pockets" on the stitchers, and material handlers use fork lifts to deliver catalog pages to the stitchers and take finished catalogs from the stitchers to shipping and receiving. Plaintiff was initially hired as a bindery worker, but he became a material handler in January 2008.

He also became a union steward in 2008, which means he started representing other employees in disciplinary and grievance proceedings. At all relevant times, defendant used a progressive discipline system for its employees, which included the following steps: 1) first violation – documented verbal warning, 2) second violation – written warning,

3) third violation – one day suspension, 4) fourth violation – termination. Depending on the severity of the rule violation, corrective action steps could be skipped. Defendant also had the option of giving an employee a suspended suspension or allowing a terminated employee to continue working under a work continuance plan. In both cases, a disciplined employee would be allowed to continue working and receive pay just like anyone else at the plant.

Prior to June 2008, plaintiff had been disciplined for attendance problems, but he had not received any negative feedback regarding his job performance. That month plaintiff acted as a union steward for two African-American employees, Dante Holland and Iris Williams. Immediately thereafter, Mike Mueller, one of plaintiff's Caucasian co-workers, confronted plaintiff. Mueller accused plaintiff of going around like a "God damned Johnnie Cochrane" and fighting for "people that are trash and don't even deserve to have a job." Mueller told plaintiff he was beginning to "piss people off" and that certain employees, including plaintiff, Holland and Williams, had targets on their backs. He said that he and other employees would not give up until these employees had their "God damn mother fucking asses" walked out the "mother fucking door." On June 18, 2008, plaintiff told the human resources manager, John Kuhnmuench, that he felt other employees were targeting him on account of his race and his position as a union steward. He did not specifically mention Mueller's threat though.

In July 2008, several employees submitted signed complaints about plaintiff's work. They said plaintiff was leaving loads in the wrong place and wasting time talking instead of working. Daryl Stott, one of plaintiff's supervisors, then scheduled an early performance review for plaintiff. At this review, which took place on August 5, 2008, Stott informed

2

plaintiff about the complaints, but refused to tell him who had complained. Plaintiff told Stott his co-workers were lying, but Stott still gave plaintiff a 1 instead of a 2—a 2 means an employee's work is acceptable. Plaintiff subsequently told Kuhnmuench that he wanted to file a formal harassment complaint against his co-workers, but he refused to specifically identify anyone who had harassed him. As a result, Kuhnmuench could not follow up on the complaint.

On October 29, 2008, plaintiff left some loads by machine operator Bruce Nickel's machine without pulling off the load slips. The load slips tell the machine operator how to print the catalogs in the load, and standard operating procedure requires a material handler to give the load slips to the machine operator whenever a load is dropped off. Nickel became upset and the two had a heated confrontation. Plaintiff was then called into the office with Nickel and given an opportunity to explain his side of the story. During this conversation, both plaintiff and Nickel got upset and raised their voices. Two days later, on October 31, 2008, a co-worker complained about plaintiff leaving his assigned work station to get a snack, and plaintiff admitted to his supervisor that he had taken a break. Kuhnmuench investigated both of these incidents and gave plaintiff a one-day suspended suspension on November 10, 2008. Nickel, who is Caucasian, was not punished because Kuhnmuench found that plaintiff had initiated the confrontation with Nickel by failing to pull load slips.

Plaintiff filed a complaint with the Equal Employment Opportunity Commission ("EEOC") alleging race discrimination and submitted a letter to human resources complaining about the discipline. He claimed the discipline constituted discrimination, harassment and retaliation because waiting to pull load slips and taking snack breaks were

3

common practices at the plant that did not normally result in punishment. He offers affidavits from five of his co-workers to prove this assertion, but these affidavits include only conclusory statements that these practices were common and do not identify any specific individuals who engaged in this kind of behavior without being disciplined. Defendant, on the other hand, has submitted copies of disciplinary forms from several non-African-American employees who did not complain about discrimination who were disciplined for violating standard procedure and leaving their assigned work areas.

On January 29, 2009, Supervisor Dennis Petersdorf saw plaintiff sitting on a carton when he was supposed to be working. As a result, Petersdorf gave plaintiff a termination notice with a work continuance agreement on February 2, 2009. Plaintiff filed another EEOC complaint on February 18, 2009 alleging that this termination was the result of discrimination and retaliation. He claims no one else was ever disciplined for sitting on the job. However, he again offers only conclusory statements from his co-workers to support this assertion. His co-workers also qualify their testimony by noting that material handlers only sat down if they had "downtime and all other major responsibilities were taken care of," and that even then they "probably should find some task to do." (Aff. Iris Williams ¶ 5, ECF No. 33; Aff. Frank Morrow ¶ 5, ECF No. 34; Aff. Bill Nevius ¶ 5, ECF No. 36.)

A few weeks later, on March 9, 2009, plaintiff received a second termination notice with a work continuance agreement because he was running late and parked illegally in front of the factory. Plaintiff again claims no one else was similarly disciplined, but the affidavits he offers from his co-workers contradict this assertion. Frank Morrow, an African-American employee, says that he has been disciplined for parking illegally, and Bruce Wells, another African-American employee, says employees generally had to move their

4

cars during their first break to avoid discipline. While Morrow claims his discipline was on account of his race, Williams, who is also African-American, claims she has parked illegally without being disciplined. Defendant has also submitted disciplinary forms for several non-African-American employees who did not complain about discrimination who were disciplined for parking in the wrong place.

On May 11, 2009, the parties entered into an informal settlement agreement in which the company did not admit liability, but agreed to reduce the November 10, 2008 discipline to a verbal warning and to withdraw the two termination notices. Defendant posted a notice about the settlement and someone wrote a note at the bottom which said, "fire him he's useless." Plaintiff took down the anonymous posting and reported it, but defendant did not take any action in response to it.

On July 10, 2009, plaintiff was assigned to work as a bindery worker temporarily, and the crew he was working with that day misprinted 9,000 catalogs. Because no one came forward to take responsibility, Petersdorf disciplined everyone working on the machine including plaintiff. The group included Caucasian and African-American employees, as well as employees who had never complained about discrimination, and defendant has similarly disciplined other teams of bindery workers in the past. Plaintiff claims the mistake was the fault of the person working at the back of the machine, while he was working at the front, but he admits the team was supposed to be rotating around the machine.

On August 6, 2009, plaintiff took off work to attend a union meeting and defendant accidentally gave him a point on his attendance record for being absent. Plaintiff pointed out the error and defendant corrected it. Then, on August 25, 2009, plaintiff asked to

5

cancel one of his overtime shifts, but Karen Hart from human resources refused to let him do so. Ordinarily, employees can cancel overtime if they offer a reasonable excuse and find a replacement. Plaintiff claims Holland, who is also African-American, was allowed to cancel his overtime for the same shift.

Also on August 25, 2009, machine operator Jeff Vandehei told plaintiff to stop spending so much time telling his co-workers about their union rights and threatened to call the office to report him. Plaintiff told him to go ahead, and Vandehei called him "Robert whatever Obama" and told plaintiff to sweep up around his machine. Plaintiff set up a meeting with management to discuss the incident with Vandehei. Petersdorf attended and informed plaintiff that if he persisted with his complaint against Vandehei both of them would be written up because Vandehei had also complained about plaintiff. Petersdorf also said that more co-workers had come forward complaining about plaintiff and that plaintiff would be under observation. After that, plaintiff was called into the office repeatedly throughout September 2009 and interviewed about complaints from co-workers who his supervisors refused to identify.[1]

As a result, plaintiff submitted a complaint to human resources against Petersdorf on September 25, 2009 claiming he had been subject to unlawful discipline and observation. Kuhnmuench responded to the complaint in a letter dated November 30, 2009 and said he found no grounds for taking action against Petersdorf. The letter also noted that plaintiff had recently identified Mueller as the person who threatened him in June

---

[1] Defendant has since identified some of the complaining individuals. These individuals include Sharon Wardlaw, an African-American material handler, Brenda Holz, a Caucasian bindery worker, and Kerry Strizic, a Caucasian material handler.

6

2008, but said that Mueller denied making any threat and that there was no other evidence to support plaintiff's claim. Therefore, Kuhnmuench had decided not to take action against Mueller. Sometime that same month, plaintiff found an anonymous note on his truck that said, "We're gonna get you, boy," but he did not report it to management. In Spring 2010, he found another anonymous note on his work station that said "Nazis are watching." He did report this note to management, but no action was taken.

Several months later, on September 7, 2010, plaintiff had an altercation with another Caucasian co-worker, Jim Hollis. Plaintiff's fork lift had a low battery from the previous shift, so plaintiff attempted to swap it for one with a fresh battery. As he was getting into a new fork lift, Hollis approached yelling and honking and asked if plaintiff was going to change the battery. Hollis then went to the supervisor's office and plaintiff followed. Hollis started yelling something about "you people" at plaintiff and put his finger in plaintiff's face, at which point plaintiff pushed Hollis' hand out of his face. On September 15, 2010, they were both disciplined for the incident. Plaintiff got a write-up and Hollis received a verbal warning. Defendant says plaintiff got a write-up because he made the confrontation physical by pushing Hollis' hand, while Hollis did not touch plaintiff.

On November 2, 2010, plaintiff was called into the office for attendance problems. Kuhnmuench had reviewed plaintiff's key card swipes from the front door for October 5, 6 and 7, 2010 and determined that he arrived at 3:00 p.m., 3:01 p.m. and 2:59 p.m. respectively. Since plaintiff's shift was supposed to start at 3:00 p.m. on those days and he still had to punch in, check the assignment board and walk to his machine, Kuhnmuench gave him three half attendance points for being tardy. These points brought plaintiff up to 6 attendance points (10 triggers a termination). Plaintiff claims these points

7

were unjustified because there were often long lines at the terminal where employees have to punch in and other employees were allowed to punch in right at the start of their shifts without discipline. However, a long line at the terminal would not explain plaintiff's late arrival.

A few days later, plaintiff asked Petersdorf why he was not allowed to be a trainer. Plaintiff said he thought it was racial discrimination because less-skilled, less-senior employees were allowed to be trainers. Petersdorf pointed out that other African-Americans were allowed to be trainers and said training positions were given to the most qualified employees. Plaintiff admits that defendant has had multiple African-American trainers, and he has not identified any employees who did not complain about discrimination who were allowed to be trainers. Plaintiff also admits trainers did not receive additional compensation.

On November 19, 2010, plaintiff was the material handler for machine 534, and he left the machine close to running out of stock and failed to flip a back up load at the end of his shift so it would be ready for use. As a result, Dave Watson, the next material handler, who is also African-American, and Brian Weisensel, the machine operator, claim they were forced to shut the machine down for part of the next shift so they could reload it. Strizic and Wardlaw (an African-American) also filed complaints against plaintiff for similar behavior on other shifts in November 2010. Based on these complaints, Kuhnmuench gave plaintiff a one-day suspended suspension on December 16, 2010. The Union grieved the December 16 discipline, and an arbitrator found defendant had proper cause to discipline plaintiff. Plaintiff cannot provide an example of another material handler

8

who failed to support his machine such that machine down time resulted who did not receive discipline.

After this incident, plaintiff began to have more problems with his co-workers. At some point in December 2010, he reported that an anonymous person had posted an anti-liberalism article that he found offensive. He says the article compared liberals to members of the Klu Klux Klan, stating that liberals are more deviant. Someone also left a note on plaintiff's machine that said "Jordan Saver." Plaintiff was not sure what it meant, but he showed it to Stott. That same month another African-American employee, Brian Shabazz, was terminated and someone wrote "buh-bye" under his name on the overtime sign-up sheet. Someone also wrote and scratched out a word ending in "a" by plaintiff's name. Plaintiff believes the word may have been "Nigga," but that is only speculation. Because of these incidents, Kuhnmuench posted notices throughout the plant warning employees about offensive comments to co-workers.

On March 1, 2011, someone wrote "Biggest Loser ever" next to plaintiff's name on an employee birthday list, and Kuhnmuench posted another warning to employees about negative comments and insults the following day. On March 10, 2011, someone placed a classified want ad for McDonald's on plaintiff's machine that had "your next job" written on it, and someone wrote "buh bye" next to Holland's name on a company posting when he was terminated shortly thereafter. Finally, plaintiff claims that in March or April 2011 someone wrote "Nazi" on the bathroom wall. Plaintiff says he called the graffiti to the attention of management, but it was never cleaned up. Plaintiff then filed this lawsuit on April 6, 2011 and voluntarily left the company a few months later.

9

## II. DISCUSSION

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When considering a motion for summary judgment, I view the evidence in the light most favorable to the non-moving party and may grant the motion only if no reasonable juror could find for plaintiff. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 255 (1986). In this case, plaintiff accuses defendant of intentionally discriminating against him because of his race, retaliating against him for complaining about discrimination, and subjecting him to a hostile work environment. He is suing under both Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2(a)(1), 2000e-3, and 42 U.S.C. § 1981, but I will only discuss Title VII because "the elements and methods of proof for § 1981 claims are 'essentially identical' to those under Title VII." *Brown v. Advocate South Suburban Hosp.*, 700 F.3d 1101, 1104 n.1 (7th Cir. 2012) (quoting *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 389 (7th Cir. 2010)). Defendant seeks summary judgment on all three of plaintiff's claims.

### A. Racial Discrimination Claim

To defeat defendant's motion for summary judgment on the intentional discrimination claim, plaintiff must offer proof of discrimination using either the direct or indirect method of proof. *Brown*, 700 F.3d at 1104 (interpreting 42 U.S.C. § 2000e-2(a)(1)). Under the direct method of proof, a plaintiff presents either direct or circumstantial evidence that proves an adverse employment action was motivated by discriminatory intent. *Id.* at 1105. If an employer has not openly admitted to discriminating, the plaintiff must construct "'a convincing mosaic of circumstantial evidence that allows a jury to infer

10

Case 2:11-cv-00334-LA   Filed 03/06/13   Page 10 of 17   Document 47

intentional discrimination by the decisionmaker.'" *Id.* (quoting *Phelan v. Cook Cnty.*, 463 F.3d 773, 779 (7th Cir. 2006)). Under the indirect method, a plaintiff can prove discrimination by showing that: "'(1) [he] is a member of a protected class, (2) [his] job performance met [the employer's] legitimate expectations, (3) [he] suffered an adverse employment action, and (4) another similarly situated individual who was not in the protected class was treated more favorably than the plaintiff.'" *Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012) (quoting *Burks v. Wis. Dept. of Transp.*, 464 F.3d 744, 750–51 (7th Cir. 2006)). If the plaintiff can establish this prima facie case of discrimination, there is a presumption of discrimination and the employer must "'articulate some legitimate, nondiscriminatory reason'" for its action. *Id.* (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). If the employer can do this, then the plaintiff must prove the employer's reason is pretextual. *Id.*

Here, plaintiff cannot succeed under either method of proof because he has not put forth sufficient evidence to prove he was subject to an adverse employment action. To support a claim of intentional discrimination, plaintiff must prove he was subject to an adverse action that "materially alter[ed] the terms or conditions of [his] employment." *Porter v. City of Chicago*, 700 F.3d 944, 954 (7th Cir. 2012). "[A] 'materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished responsibilities, or other indices that might be unique to a particular situation.'" *Id.* (quoting *Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993)). Plaintiff claims he was subject to an adverse employment action because defendant gave him two

11

termination notices, but these notices were not sufficient to prove employment discrimination because they were "reprimands with no material consequences." *Id.* at 955; *see also Lloyd v. Swifty Transp., Inc.*, 552 F.3d 594, 602 (7th Cir. 2009) ("[W]ritten reprimands without any changes in the terms or conditions of [plaintiff's] employment are not adverse employment actions."). Both termination notices were accompanied by work continuance agreements that allowed plaintiff to continue working normally until defendant withdrew the notices altogether. Therefore, I will grant defendant's motion for summary judgment on the intentional discrimination claim.[2]

**B. Retaliation Claim**

Plaintiff's next claim is that defendant retaliated against him for filing discrimination complaints. Title VII prohibits an employer from taking an adverse action against an employee who has opposed discrimination in the workplace. "In a retaliation case, an adverse action is 'one that a reasonable employee would find to be materially adverse such that the employee would be dissuaded from engaging in the protected activity.'" *Silverman v. Bd. of Educ. of City of Chicago*, 637 F.3d 729, 740 (7th Cir. 2011) (quoting *Roney v. Ill. Dept. of Transp.*, 474 F.3d 455, 461 (7th Cir. 2007)). Just as with intentional discrimination, a plaintiff may prove retaliation using either the direct or indirect method of proof. *Id.*

Plaintiff's claim fails under the direct method of proof because he has not offered sufficient direct or circumstantial evidence to allow a jury to infer that any of the discipline

---

[2] All of the cases plaintiff cites for the proposition that a threat of termination alone can constitute an adverse employment action are cases discussing retaliation claims, where the standard for proving an adverse action is more lenient. *See Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006) ("[Title VII's] antiretaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment.").

12

or unfavorable performance reviews he received were motivated by retaliatory animus. Plaintiff claims the timing of his first negative performance review was suspicious because the only problems he had prior to filing his first discrimination complaint were attendance problems, but he also admits that the performance rating he received was the result of complaints from his co-workers. And, while plaintiff disputes the accuracy of his co-workers' comments, he has not offered any evidence that indicates any of the individuals who complained about him acted out of a desire to retaliate against him for complaining about discrimination. *See Dickerson v. Bd. of Trs. of Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 603 (7th Cir. 2011) (quoting *Brill v. Lante Corp.*, 119 F.3d 1266, 1273 (7th Cir. 1997)) ("'The question is not whether the employer's performance ratings were *right* but whether the employer's description of its reasons is *honest*.'").

Plaintiff's retaliation claim also fails under the indirect method of proof because he has not offered any specific examples of similarly situated individuals who did not complain about discrimination who were treated more favorably. He attempts to point to Nickel and Hollis as examples of people who received more favorable treatment, but his argument fails because Nickel and Hollis were not similarly situated to plaintiff. Nickel did not violate standard operating procedure by failing to deliver load slips or leave his work area for an unscheduled snack break, and Hollis did not get physical with another employee. *See Argyropoulos v. City of Alton*, 539 F.3d 724, 735 (7th Cir. 2008) (requiring a plaintiff to identify an employee who engaged in similar misconduct to satisfy the similarly situated requirement). Therefore, defendant is also entitled to summary judgment on plaintiff's retaliation claim.

13

**B. Hostile Work Environment Claim**

Plaintiff's last claim is that defendant violated Title VII by subjecting him to racial harassment that created a hostile work environment. To prevail on this claim, plaintiff must prove "(1) [his] work environment was both objectively and subjectively offensive; (2) the harassment complained of was based on [his race]; (3) the conduct was either severe or pervasive; and (4) there is a basis for employer liability." *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 840 (7th Cir. 2009).

I will start with the second element of this test by identifying the conduct that arguably constituted racial harassment. Plaintiff first claims that his supervisors harassed him by repeatedly calling him into the office to respond to co-worker complaints that were motivated by racial animus. Plaintiff argues his supervisors should have more carefully scrutinized the complaints before asking him to respond to them because plaintiff had informed management that his co-workers were targeting him on account of his race. However, defendant had an obligation to follow-up on the complaints and the record indicates it did carefully scrutinize them. Only a handful of them resulted in discipline, and in those cases plaintiff's rule violations were well-documented. There is also no evidence that any of the complaints were actually motivated by racial animus. The only employees who allegedly made racist comments to plaintiff were Mueller, Vandehei and Hollis, and they never filed formal complaints against him. Plaintiff's testimony that Mueller told him other employees were conspiring to get African-Americans fired is inadmissible hearsay. Further, plaintiff presents no evidence linking any co-workers who complained about

14

plaintiff to the anonymous notes plaintiff received. Thus, the counseling sessions plaintiff received from his supervisors did not constitute racial harassment.

Plaintiff further argues that the formal discipline he received constituted racial harassment because he was punished for violating rules that were not usually enforced. However, the record shows that most of the rules at issue were enforced. The only instance where plaintiff was even arguably singled out was when he was denied the opportunity to cancel overtime on August 25, 2009, and there is no evidence that would allow a reasonable juror to conclude that this denial was on account of race. As plaintiff himself avers, at least one other African-American employee was allowed to cancel overtime for the same shift. Plaintiff now tries to distinguish himself from this individual by arguing that defendant singled him out because he was a union steward and defendant did not like African-Americans who stood up for their rights, but there is no direct or circumstantial evidence linking the overtime incident to plaintiff's union work. For example, there is no evidence that other African-American union stewards were similarly mistreated. As a result, a reasonable juror could not find that any of the formal discipline plaintiff received was racial harassment.

Finally, plaintiff claims that he was racially harassed by his co-workers. Assuming the harassment from plaintiff's co-workers was racially motivated, I still need to consider whether there is a basis for employer liability. An employer is liable for harassment by a co-worker if the employer is notified of it and does not promptly respond to it "in a manner reasonably likely to end the harassment." *Sutherland v. Wal-Mart Stores, Inc.*, 632 F.3d 990, 994–95 (7th Cir. 2011). What is reasonably likely to end harassment depends on the

15

fact of the case, including the "gravity of the harassment alleged." *May v. Chrysler Group, LLC*, 692 F.3d 734, 743 (7th Cir. 2012) (quoting *McKenzie v. Ill. Dept. of Transp.*, 92 F.3d 473, 480 (7th Cir. 1996)). Here, defendant responded appropriately to most of what plaintiff complained of. Kuhnmuench took down most of the publicly posted comments and in December 2010 and March 2011 issued warnings to employees about making negative comments. He also spoke with Mueller about the threat he allegedly made to plaintiff and gave Hollis a verbal warning for yelling at plaintiff. Given that there was no evidence Mueller had followed up on his threat and that the other reported comments were anonymous and not explicitly threatening, I find that Kuhnmuench's efforts were sufficient to shield defendant from liability for most of the harassment.[3]

The only incidents that management did not address were the note that said "fire him, he's useless" in November 2008, the incident where Vandehei called plaintiff "Robert whatever Obama" in August 2009, the note that said "Nazis are watching" in Spring 2010, and the word "Nazi" that was left on the bathroom wall in March 2011. These incidents, however, were not sufficient to create a hostile work environment. To determine whether a hostile work environment existed, I consider the totality of the circumstances, including "the severity of the allegedly discriminatory conduct, its frequency, whether it is physically threatening or humiliating or merely offensive, and whether it unreasonably interferes with an employee's work performance." *Scruggs*, 587 F.3d at 840. "Offhand comments, isolated incidents, and simple teasing do not rise to the level of conduct that alters the terms and conditions of employment." *Id.* Since none of the incidents at issue involved the use of

---

[3] Here, I do not consider the note that said, "We're gonna get you, boy," because plaintiff never reported it.

16

racial slurs or explicit threats against plaintiff or any other minority employee and at least six months passed between each one, I find that they were isolated incidents not sufficiently severe or pervasive to create a hostile work environment. As a result, I will also grant defendant's motion for summary judgment on the hostile work environment claim.

## III. CONCLUSION

**THEREFORE, IT IS ORDERED** that defendant's motion for summary judgment (Docket #17) is **GRANTED**.

Dated at Milwaukee, Wisconsin, this 6th day of March 2013.

                                                    s/ Lynn Adelman
                                                    _____
                                                    LYNN ADELMAN
                                                    District Judge